FILED: 3/12/2021 11:17 AM
David Trantham
Denton County District Clerk
By: Cameron Welter, Deputy

## CAUSE NO. 21-1225-362

| | | |
|---|---|---|
| INTERSTATE SERVICE PROVIDER, INC | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | DENTON COUNTY, TEXAS |
| | § | |
| WAYNE JORDAN, LANTER | § | |
| DELIVERY SYSTEMS, LLC, | § | |
| and WHITE LINE SYSTEMS, LLC, | § | |
| Et Al. | § | |
| | § | |
| *Defendants* | § | 362ⁿᵈ JUDICIAL DISTRICT |

362nd JUDICIAL DISTRICT

### PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW INTERSTATE SERVICE PROVIDER, INC. (hereinafter referred to as PLAINTIFF), complaining of **WAYNE JORDAN, JACKIE NORMAN, CHRISTOPHER RODRIGUEZ, RICHARD SCOTT, JOHNNY MOSES, AUSTIN SPANN, KRIS CHILDS, JOHNNY GARCIA, WILLIAM GEE, ANTHONY BEAVER, ALMUS WORD, VINCENT VASQUEZ, KELLY HIGGINBOTHAM, LESTER PEREZ, BILLY WILKS, JOHN MCCARTY, ZACHARY FENNELL, ARTHUR JONES, JOSE CABRERA ROQUE, JORDAN WING, JARED HENSON, CHRISTOPHER THOMPSON, JASON PANTOHAN, CHRIS MONTERO, LUIS MARTINEZ, RAYMOND BROCK, KENNETH GAY, RYAN FITZPATRICK, CHARLEY JORDAN, MICHAEL BULLARD, JORDAN RUTZEN, JAMES WHITE, DAVID MCGLOTHLIN, SHANNON GAY, MARK FERRELL, DREAPHYS SANDERS, TYREE WILLIAMS, MARVIN WASHINGTON, TIM ELLIS, DARRELL GRIMES, RENARD BROWN, RECCO LEWIS, VICTOR ALEXANDER, MICHAEL KELLY, MARQUIS SWYGART, THOMAS WILLIAMS, DENNIS CROFT, WILLIAM FORD, BRIAN BROADNAX, ROBERT MAYS, RONNIE**

ALLISON, ADAM GAITHER, STEVEN CARTER, TERRY MCCULLOUGH, JERRY YOUNG, HOWARD JACKSON, STEPHEN ALSTON, JAMES DICKSON, RICHARD MOORE, CHARLES SHERRARD, GERALD MOORE, WILLIE MACQUEENETTE, CHRIS PARKER, CHRISTOPHER DENNIS, CHARLES OKECH, LARRY FREDRICK, ROY MONROE, MICHAEL MINNIEAR, CHRIS WEAVER, RAMONE SMITH, JONATHAN POLK, JACK WEST, ROBERT THOMASON, JIMMIE DAVIS, CLINT JOHNSON, DAVID ARTEAGA, NKAINA NKAINA, BRIAN WHITAKER, DEXTER C SMITH, CORY HAMILTON, ASA WEIR, ROBERT SOLIZ, WALDO CASTILLO, CARLOS TREJO, GUADALUPE ALVAREZ, ERICK TREJO, RICARDO MARTINEZ, DARRYL CUNNINGHAM, JAMES RIZZATTO, RICK MONTEZ, RICHARD MURRELL, REYNALDO PARDILLO, BRIAN WEIBEL, MATHEW GEISS, ANTHONY AUGUSTA, ANTHONY JONES, BYRON JONES, CHRISTIAN LARK, FLOYD CITIZEN, JOHNNIE HUNTER, KEYMON HOUSTON, MIKE MCGRUDER, RANDALL THOMAS, REX BODDEN, RODERICK DAVIS, SCHANN BRATTON, SEIGFRIED COOPER, TANZA TOWNSEND, TIMOTHY ROBERTSON, ULYSSES GRANGER, XAVIER JONES, TODD LYONS, MALCOLM WILTZ, ALEXIS JAMES, TIM BURKS, JOSHUA WILLIAMS, JAMEEL ORDAY, LANTER DELIVERY SYSTEMS, LLC, **and** WHITE LINE SYSTEMS, LLC (hereinafter collectively referred to as DEFENDANTS)**, and** files this, **PLAINTIFF'S FIRST AMENDED PETITION,** and for such cause would respectfully show the Court the following:

# I.

## Rule 47 Disclosure

1.      Pursuant to Tex. R. Civ. P. 47(c)(5), Plaintiff is seeking monetary relief over $1,000,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees.

# II.

## Discovery Control Plan

2.      Plaintiff states that the discovery in this matter should be conducted under Level 3, as provided in Rule 190.4.  Plaintiffs reserve the right to modify such plan as provided by Texas Rule of Civil Procedure 190.4.

# III.

## Parties, Jurisdiction, and Venue

3.      Plaintiff INTERSTATE SERVICE PROVIDER, INC. ("ISP"), is a Texas corporation, with a primary address of 899 Henrietta Creek Road, Ste. 200, Roanoke, TX 76262.

4.      Defendant Wayne Jordan is an individual who resides in Texas and may be served with process at 6309 County Rd 608, Burleson, TX 76028, or wherever he may be found.

5.      Defendant Lanter Delivery Systems, LLC is a Delaware LLC doing business in Texas. Lanter Delivery Systems, LLC can be served by and through its registered agent CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

6.      Defendant White Line Systems, LLC is a Texas LLC. White Line Systems, LLC can be served by and through its registered agent Paracorp Incorporated, at 14001 W. Hwy. 29 Suite 102, Liberty Hill, Texas 78642.

7.      Defendant Jackie Norman is an individual who resides in Texas and may be served with process at 5233 Llano Street, Abilene, TX 79605, or wherever she may be found.

8.      Defendant Christopher Rodriguez is an individual who resides in Texas and may be served with process at 814 Rose Street, Merkel, TX 79536, or wherever he may be found.

9.      Defendant Richard Scott is an individual who resides in Texas and may be served with process at 10 W. Majestic, Winters, TX 79567, or wherever he may be found.

10.     Defendant Johnny Moses is an individual who resides in Texas and may be served with process at 7526 Salerno Court, Abilene, TX 79606, or wherever he may be found.

11.     Defendant Austin Spann is an individual who resides in Texas and may be served with process at 6290 Put Road, Apt. 1271 B, Clyde, TX 79510, or wherever he may be found.

12.     Defendant Kris Childs is an individual who resides in Texas and may be served with process at 6103 7th Street, Lubbock, TX 79416, or wherever he may be found.

13.     Defendant Johnny Garcia is an individual who resides in Texas and may be served with process at 10307 Valencia Ave., Lubbock, TX 79424, or wherever he may be found.

14.     Defendant William Gee is an individual who resides in Texas and may be served with process at 6703 82nd Street, Apt. 324, Lubbock, TX 79424, or wherever he may be found.

15.     Defendant Anthony Beaver is an individual who resides in Texas and may be served with process at 202 S. Mesquite Street, Tent, TX 79561, or wherever he may be found.

16.     Defendant Almus Word is an individual who resides in Texas and may be served with process at 1707 Mimosa Drive, Abilene, TX 79603, or wherever he may be found.

17.     Defendant Vincent Vasquez is an individual who resides in Texas and may be served with process at 750 Beechwood Lane, Abilene, TX 79603, or wherever he may be found.

18.     Defendant Kelly Higginbotham is an individual who resides in Texas and may be served with process at 2119 Grande Ave., Abilene, TX 79605, or wherever she may be found.

19.     Defendant Lester Perez is an individual who resides in Texas and may be served with

process at 7517 Mazatian Drive, El Paso, TX 79915, or wherever he may be found.

20. Defendant Billy Wilks is an individual who resides in Texas and may be served with process at 8806 FM 1812, Merkel, TX 79536, or wherever he may be found.

21. Defendant John McCarty is an individual who resides in Texas and may be served with process at 123 Bullwagon Road, Merkel, TX 79536, or wherever he may be found.

22. Defendant Zachary Fennell is an individual who resides in Texas and may be served with process at 28 Lytle Place Drive, Abilene, TX 79602, or wherever he may be found.

23. Defendant Arthur Jones is an individual who resides in Texas and may be served with process at 12001 Dessau Road, Apt. 1722, Austin, TX 78754, or wherever he may be found.

24. Defendant Jose Cabrera Roque is an individual who resides in Texas and may be served with process at 18825 Keeli Lane, Pflugerville, TX 78660, or wherever he may be found.

25. Defendant Jordan Wing is an individual who resides in Texas and may be served with process at 1260 Morningwood Drive, San Marcos, TX 78666, or wherever he may be found.

26. Defendant Jared Henson is an individual who resides in Texas and may be served with process at 111 Toby Trail, Hutto, TX 78634, or wherever he may be found.

27. Defendant Christopher Thompson is an individual who resides in Texas and may be served with process at 528 Breezygrass Way, Georgetown, TX 78626, or wherever he may be found.

28. Defendant Jason Pantohan is an individual who resides in Texas and may be served with process at 1431 Old Highway 20, Mcdade, TX 78650, or wherever he may be found.

29. Defendant Chris Montero is an individual who resides in Texas and may be served with process at 703 North LH35, Apt. 15-G, San Marcos, TX 78666, or wherever he may be found.

30. Defendant Luis Martinez is an individual who resides in Texas and may be served with process at 2609 Bigleaf Drive, Killeen, TX 76549, or wherever he may be found.

31.     Defendant Raymond Brock is an individual who resides in Texas and may be served with process at 4357 Laguardia Lane, Fort Worth, TX 76155, or wherever he may be found.

32.     Defendant Kenneth Gay is an individual who resides in Texas and may be served with process at 2518 Blyth, Dallas, TX 75228, or wherever he may be found.

33.     Defendant Ryan Fitzpatrick is an individual who resides in Texas and may be served with process at 3953 Thoroughbred Trail, Fort Worth, TX 76123, or wherever he may be found.

34.     Defendant Charley Jordan is an individual who resides in Texas and may be served with process at 5313 Blue Quartz Rd., Fort Worth, TX 76179, or wherever he may be found.

35.     Defendant Michael Bullard is an individual who resides in Texas and may be served with process at 1500 West Lovers Lane Apt. 118, Arlington, TX 76013, or wherever he may be found.

36.     Defendant Jordan Rutzen is an individual who resides in Texas and may be served with process at 400 Hillside Drive, Aledo, TX 76008, or wherever he may be found.

37.     Defendant James White is an individual who resides in Texas and may be served with process at 833 Lariat Dr., Saginaw, TX 76131, or wherever he may be found.

38.     Defendant David Mcglothlin is an individual who resides in Texas and may be served with process at 3800 County Road 417A, Cleburne, TX 76031, or wherever he may be found.

39.     Defendant Shannon Gay is an individual who resides in Texas and may be served with process at 1425 Julie Street, Seagoville, TX 75159, or wherever she may be found.

40.     Defendant Mark Ferrell is an individual who resides in Texas and may be served with process at 149 S. Fork Drive, Weatherford, TX 76087, or wherever he may be found.

41.     Defendant Dreaphus Sanders is an individual who resides in Texas and may be served with process at 811 Encino Drive, Arlington, TX 76001, or wherever he may be found.

42.     Defendant Tyree Williams is an individual who resides in Texas and may be served with

process at 9000 Vantage Point Drive #1121, Dallas, TX 75243, or wherever he may be found.

43.     Defendant Marvin Washington is an individual who resides in Texas and may be served with process at 1115 Easton Road, Dallas, TX 75218, or wherever he may be found.

44.     Defendant Tim Ellis is an individual who resides in Texas and may be served with process at 1412 W. 6th St. APT 117, Irving, TX 75060, or wherever he may be found.

45.     Defendant Darrell Grimes is an individual who resides in Texas and may be served with process at 6541 Glenview Drive APT. 541, North Richland Hills, TX 76180, or wherever he may be found.

46.     Defendant Renard Brown is an individual who resides in Texas and may be served with process at 1402 James St., Cedar Hill, TX 75104, or wherever he may be found.

47.     Defendant Recco Lewis is an individual who resides in Texas and may be served with process at 846 Robin Meadow Ct., Desoto, TX 75115, or wherever he may be found.

48.     Defendant Victor Alexander is an individual who resides in Texas and may be served with process at 4405 Rising Sun Court, Arlington, TX 76017, or wherever he may be found.

49.     Defendant Michael Kelly is an individual who resides in Texas and may be served with process at 3002 Park Square Drive APT 203, Irving, TX 75060, or wherever he may be found.

50.     Defendant Marquis Swygart is an individual who resides in Texas and may be served with process at 1559 Knottingham Dr., Little Elm, TX 75068, or wherever he may be found.

51.     Defendant Thomas Williams is an individual who resides in Texas and may be served with process at 736 Bridle Trail, Saginaw, TX 76179, or wherever he may be found.

52.     Defendant Dennis Croft is an individual who resides in Texas and may be served with process at 8905 La Prada Drive, Dallas, TX 75228, or wherever he may be found.

53.     Defendant William Ford is an individual who resides in Texas and may be served with

process at 303 N. Hyde Park Blvd. Apt. 521, Cleburne, TX 76033, or wherever he may be found.

54.     Defendant Brian Broadnax is an individual who resides in Texas and may be served with process at 207 Crestview Drive, Arlington, TX 76018, or wherever he may be found.

55.     Defendant Robert Mays is an individual who resides in Texas and may be served with process at 4124 FM 2415, Cleburne, TX 76031, or wherever he may be found.

56.     Defendant Ronnie Allison is an individual who resides in Texas and may be served with process at 6917 Wooddale Drive, Watauga, TX 76148, or wherever he may be found.

57.     Defendant Adam Gaither is an individual who resides in Texas and may be served with process at 2423 Limestone Drive, Arlington, TX 76014, or wherever he may be found.

58.     Defendant Steven Carter is an individual who resides in Texas and may be served with process at 5970 Baymort Court Apt. 1089, Fort Worth, TX 76112, or wherever he may be found.

59.     Defendant Terry McCullough is an individual who resides in Texas and may be served with process at 3001 East Ave. K Apt. 242, Grand Prairie, TX 75050, or wherever he may be found.

60.     Defendant Jerry Young is an individual who resides in Texas and may be served with process at 4325 Rufe Snow Dr. Apt. 1021, North Richland Hills, TX 76180, or wherever he may be found.

61.     Defendant Howard Jackson is an individual who resides in Texas and may be served with process at 7216 Jamaica Way, North Richland Hills, TX 76180, or wherever he may be found.

62.     Defendant Stephen Alston is an individual who resides in Texas and may be served with process at 411 Paddock Lane, Celina, TX 75009, or wherever he may be found.

63.     Defendant James Dickson is an individual who resides in Texas and may be served with

process at 3404 Wendell Drive, North Richmond Heights, TX 76117, or wherever he may be found.

64.     Defendant Richard Moore is an individual who resides in Texas and may be served with process at 8299 Small Block Road Apt. 221, Northlake, TX 76262, or wherever he may be found.

65.     Defendant Charles Sherrard is an individual who resides in Texas and may be served with process at 1916 Sunflower Lane, Glen Heights, TX 75154, or wherever he may be found.

66.     Defendant Gerald Moore is an individual who resides in Texas and may be served with process at 4725 Orchard Ridge, Garland, TX 75043, or wherever he may be found.

67.     Defendant Willie Macqueenette is an individual who resides in Texas and may be served with process at 8220 Cloveglen Lane, Fort Worth, TX 76123, or wherever he may be found.

68.     Defendant Chris Parker is an individual who resides in Texas and may be served with process at 3101 Timber Ridge Point, Grapevine, TX 76051, or wherever he may be found.

69.     Defendant Christopher Dannis is an individual who resides in Texas and may be served with process at 5901 Dunnlev Drive, Fort Worth, TX 76179, or wherever he may be found.

70.     Defendant Charles Okech is an individual who resides in Texas and may be served with process at 3900 Oakridge Court Apt. 3401, Fort Worth, TX 76155, or wherever he may be found.

71.     Defendant Laurence Frederick is an individual who resides in Texas and may be served with process at PO Box 184, Henrietta, TX 76365, or wherever he may be found.

72.     Defendant Roy Monroe is an individual who resides in Texas and may be served with process at 3218 Seymour Road Apt. 5G, Wichita Falls, TX 76309, or wherever he may be found.

73.     Defendant Michael Minniear is an individual who resides in Oklahoma and may be served with process at 2202 East 55th Court, Tulsa, OK 74105, or wherever he may be found.

74.     Defendant Chris Weaver is an individual who resides in Oklahoma and may be served with process at 1789 West 100 St. N, Wagoner, OK 74467, or wherever he may be found.

75.     Defendant Ramone Smith is an individual who resides in Oklahoma and may be served with process at 1946 East 29th St. North, Tulsa, OK 74110, or wherever she may be found.

76.     Defendant Jonathan Polk is an individual who resides in Texas and may be served with process at 2501 Nogales Drive, Fort Worth, TX 76108, or wherever he may be found.

77.     Defendant Jack West is an individual who resides in Texas and may be served with process at 500 North Tarrant Parkway Apt. 414, Keller, TX 76248, or wherever he may be found.

78.     Defendant Robert Thomason is an individual who resides in Texas and may be served with process at 4536 Spring View Lane # 6305, Keller, TX 76244, or wherever he may be found.

79.     Defendant Jimmie Davis is an individual who resides in Texas and may be served with process at 765 Keel Line Drive, Crowley, TX 76036, or wherever he may be found.

80.     Defendant Clint Johnson is an individual who resides in Texas and may be served with process at 500 Rolling Hills Pl # 302, Lancaster, TX 75146, or wherever he may be found.

81.     Defendant David Arteaga is an individual who resides in Texas and may be served with process at 541-A Berke St., Newark, TX 76071, or wherever he may be found.

82.     Defendant NKaina Nkaina is an individual who resides in Texas and may be served with process at 1804 Stone Crest Drive, Flower Mound, TX 75028, or wherever he may be found.

83.     Defendant Brian Whitaker is an individual who resides in Texas and may be served with process at 3956 Country Lane, Fort Worth, TX 76123, or wherever he may be found.

84.     Defendant Dexter C Smith is an individual who resides in Texas and may be served with process at 601 North Park Blvd, Grapevine, TX 76051, or wherever he may be found.

85.     Defendant Cory Hamilton is an individual who resides in Texas and may be served with

process at 5614 Boca Raton Blvd, Fort Worth, TX 76112, or wherever he may be found.

86.    Defendant Asa Weir is an individual who resides in Texas and may be served with process at 4305 Mantis St., Fort Worth, TX 76106, or wherever he may be found.

87.    Defendant Robert Soliz is an individual who resides in Texas and may be served with process at 3420 Livingston Ave., Fort Worth, TX 76110, or wherever he may be found.

88.    Defendant Waldo Castillo is an individual who resides in Texas and may be served with process at 1106 Plum, Floresville, TX 78114, or wherever he may be found.

89.    Defendant Carlos Trejo is an individual who resides in Texas and may be served with process at 1510 Santa Anna, San Antonio, TX 78201, or wherever he may be found.

90.    Defendant Guadalupe Alvarez is an individual who resides in Texas and may be served with process at 349 Consuelo, San Antonio, TX 78228, or wherever he may be found.

91.    Defendant Erick Trejo is an individual who resides in Texas and may be served with process at 1510 Santa Anna, San Antonio, TX 78201, or wherever he may be found.

92.    Defendant Ricardo Martinez is an individual who resides in Texas and may be served with process at 3505 Yucca Avenue, McAllen, TX 78504, or wherever he may be found.

93.    Defendant Daryl Cunningham is an individual who resides in Texas and may be served with process at 206 Rinehardt, Hutto, TX 78634, or wherever he may be found.

94.    Defendant James Rizzatto is an individual who resides in Texas and may be served with process at 1595 Gardenia Drive, New Braunfels, TX 78130, or wherever he may be found.

95.    Defendant Rick Montez is an individual who resides in Texas and may be served with process at 5801 W. Business 83 Lot 17, Harlingen, TX 78550, or wherever he may be found.

96.    Defendant Richard Murrell is an individual who resides in Texas and may be served with process at 917 Rose Street, Corpus Christi, TX 78418, or wherever he may be found.

97.     Defendant Anthony Augusta is an individual who resides in Texas and may be served with process at 10218 Riverdale Park Lane, Houston, TX 77070, or wherever he may be found.

98.     Defendant Rex Bodden is an individual who resides in Texas and may be served with process at 5438 Cherry Creek Drive, Houston, TX 77017, or wherever he may be found.

99.     Defendant Schann Bratton is an individual who resides in Texas and may be served with process at 9307 Goodmeadow Drive, Houston, TX 77064, or wherever he may be found.

100.     Defendant Tim Burks is an individual who resides in Texas and may be served with process at 1515 Rudel Road, Tomball, TX 77375, or wherever he may be found.

101.     Defendant Floyd Citizen is an individual who resides in Texas and may be served with process at 3816 Calendar Street, Houston, TX 77009, or wherever he may be found.

102.     Defendant Siegfried Lanier Cooper is an individual who resides in Texas and may be served with process at 2201 West Orem Dr., Houston, TX 77047, or wherever he may be found.

103.     Defendant Anthony Jones is an individual who resides in Texas and may be served with process at 11514 Poplarwood Drive, Houston, TX 77089, or wherever he may be found.

104.     Defendant Byron Jones is an individual who resides in Texas and may be served with process at 17610 Cali Drive, Apt. 325, Houston, TX 77090, or wherever he may be found.

105.     Defendant Christian Lark is an individual who resides in Texas and may be served with process at 2901 Briarhurst Drive Apt. 407, Houston, TX 77057, or wherever he may be found.

106.     Defendant Johnnie Hunter is an individual who resides in Texas and may be served with process at 2711 Druid Street, Houston, TX 77091, or wherever he may be found.

107.     Defendant Keymon Houston is an individual who resides in Texas and may be served with process at 103 East Edgebrook Drive Apt. 4004, Houston, TX 77034, or wherever he may be found.

108.     Defendant Mike McGruder is an individual who resides in Texas and may be served with process at 3726 Holman Street, Houston, TX 77004, or wherever he may be found.

109.     Defendant Randall Thomas is an individual who resides in Texas and may be served with process at 15315 Meadows Drive, Houston, TX 77068, or wherever he may be found.

110.     Defendant Roderick Davis is an individual who resides in Texas and may be served with process at 17303 Davenway Drive, Houston, TX 77084, or wherever he may be found.

111.     Defendant Tanza Townsend is an individual who resides in Texas and may be served with process at 1910 Westmead Drive Apt. 4312, Houston, TX 77077, or wherever he may be found.

112.     Defendant Timothy Robertson is an individual who resides in Texas and may be served with process at 7645 South Hall, Houston, TX 77028, or wherever he may be found.

113.     Defendant Ulysses Granger is an individual who resides in Texas and may be served with process at 6939 Fauna Street, Houston, TX 77061, or wherever he may be found.

114.     Defendant Xavier Jones is an individual who resides in Texas and may be served with process at 301 Wilcrest Apt. 6844, Houston, TX 77077, or wherever he may be found.

115.     Defendant Malcolm Wiltz is an individual who resides in Texas and may be served with process at 5347 Quail Tree Lane, Humble, TX 77346, or wherever he may be found.

116.     Defendant Todd Lyons is an individual who resides in Texas and may be served with process at 1326 Rising Springs Lane, Houston, TX 77073, or wherever he may be found.

117.     Defendant Alexis James is an individual who resides in Texas and may be served with process at 6347 Channelbrook Lane, Spring, TX 77379, or wherever she may be found.

118.     Defendant Joshua Williams is an individual who resides in Texas and may be served with process at 10022 Memorial Way Drive, Tomball, TX 77375, or wherever he may be found.

119.     Defendant Mathew Geiss is an individual who resides in Texas and may be served with

process at 25222 Northwest Freeway #259, Cypress, TX 77429, or wherever he may be found.

120. Defendant Bryan Weibel is an individual who resides in Texas and may be served with process at 3915 Broadway Street Apt. 10, Galveston, TX, 77550, or wherever he may be found.

121. Defendant Reynaldo Pardillo is an individual who resides in Texas and may be served with process at 14010 Panhandle Drive, Sugar Land, TX 77498, or wherever he may be found.

122. Defendant Jameel Orday is an individual who resides in Texas and may be served with process at 10851 West Montfair Blvd. Apartment 331212, The Woodlands, TX 77382, or wherever he may be found.

123. This Court has jurisdiction, and venue is properly laid in Denton County, because paragraph 25 of the contract documents governing the relationship between the parties and attached to this Petition, requires that any claim or dispute be brought in a Texas Court closest to ISP's office in Roanoke, Texas.

## IV.

### Factual Background

124. Plaintiff is a centrally owned and managed for-profit business entity ("Carrier") operating in numerous locations throughout the United States engaging in the business of receiving, hauling, and delivering multiple classes of freight throughout the United States.

125. The individually named Defendants are former Independent Contractor Commercial Truck Drivers for Plaintiff. ("Defendant Drivers"). Lanter Delivery Systems, LLC is a broker, and White Line Systems, LLC is a Carrier that was created to directly convert the Defendant Drivers away from Plaintiff.

126. Plaintiff connects and manages three (3) essential roles in the transportation industry:

   A. Drivers: Independent Contractor Commercial Truck Drivers, such as Defendants.

B.  Lessors of trucks, trailers, and other such equipment, such as Ryder Transport Company and Penske Truck Leasing.

C.  Brokers:  such as Lanter Delivery Systems, LLC.

127.  This lawsuit relates to the relationship between Plaintiff as Carrier and Defendants as Drivers, Carrier, and Broker.

128.  Defendant Drivers executed an Independent Contractor Agreement (the "Contract"), with the Plaintiff.  A copy of a one of the contracts is attached hereto as **Exhibit A**, and the Contracts are identical for all the Defendant Drivers and hundreds of others in the United States.

129.  In regard to **Termination of the Contract** by Contractor, the Contract establishes:

A.  Ten (10) business days 'notice requirement, where CONTRACTOR shall be liable for payment equal to the average daily compensation multiplied by the number of days short of ten (10).

B.  CONTRACTOR must remove and return to CARRIER all CARRIER's identification and property from the Equipment and return it to CARRIER to CARRIER's nearest terminal, or face CARRIER'S attorneys' fees and collections costs incurred therewith.

130.  In regard to **Compliance with Pertinent Laws and Regulations by Contractor**, the Contract establishes:

a.  CONTRACTOR shall provide competent professional drivers meeting all Department of Transportation ("DOT") requirements and CARRIER's minimum qualifications;

b.  CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of

CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

131. In regard to **Use of Carrier's Equipment**, the Contract establishes:

    A.      CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER… to CARRIER immediately upon CARRIER's request or upon termination of this Agreement…    In the event CONTRACTOR for any reason fails to comply with this provision…CONTRACTOR agrees to reimburse CARRIER for all recovery expenses and costs, including attorney fees.

    B.      CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

132. In regard to **Contractor's Responsibilities**, the Contract establishes:

    A.      Exclusive Possession and Responsibility. The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER.

133. In regard to **Confidentiality and Non-Solicitation**, the Contract establishes:

    A.      CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers… is a valuable, special and unique asset of the business of CARRIER.

    B.      CONTRACTOR agrees…

      i.      Not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent.

      ii.     To preserve as "Confidential Matters", all trade secrets, know-how, and information relating to CARRIER's business, forms, processes, routes, delivery information, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement.

     iii.     To regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER.

C.     In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, **CARRIER shall be entitled to an injunction**, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters.

D.     CONTRACTOR agrees that **CARRIER will be irreparably damaged in the event of any breach of this provision** by CONTRACTOR… and **CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision, without the posting of any bond or other security and shall not be**

required to demonstrate any actual injury or damage to obtain injunctive relief from the courts.

E.  [CONTRACTOR] will not solicit traffic (shipping/hauling/delivery work) from any shipper, consigner, consignee or customer of CARRIER where (1) the availability of such traffic first became known to [CONTRACTOR] as a result of CARRIER efforts, or (2) the traffic of the shipper, consigner, consignee or customer of CARRIER was first tendered to the [CONTRACTOR] by CARRIER.

F.  If [CONTRACTOR] breaches this contract and directly or indirectly delivers or solicits traffic from customers of ISP and obtains traffic from such customers during the term of this contract of twenty-four (24) months thereafter, as a result of adverse routing impact arising from loss of business by virtue of violation of this provision, **[CONTRACTOR] shall be obligated to pay CARRIER, for a period of fifteen (15) months thereafter, as liquidated damages and not as a penalty, the amount equal to seventy-five percent (75%) of the transportation revenue resulting from traffic transported for such customers**, and [CONTRACTOR] will provide CARRIER with all documentation requested by CARRIER to verify such transportation revenue.

<u>DEFENDANTS' BREACH AND OTHER MISCONDUCT</u>

134.    On numerous occasions, on or before August 22, 2020, Defendant Drivers engaged with officers, directors, agents, from Plaintiff's Broker, Lanter Delivery Systems ("Broker Lanter"), along with former employees of Plaintiff, ("Former Employees") at one or more of the following terminal locations:  Roanoke, TX, Corpus Christi, TX, Abilene, TX, Austin, and TX, Houston, TX.

135.     Defendant Drivers, Broker Lanter, and Former Employees hatched a scheme whereby:

    A.     A new company would be created called White Line Systems, LLC ("White Line").

    B.     Defendant Drivers would imminently cease driving for Plaintiff and switch to White Line, without notice or warning, and begin driving the same routes, using the same trucks, and using the same equipment.

    C.     Defendant Drivers would receive their bonuses, regular compensation, and "protection" from legal consequences coming from Plaintiff or Regulatory Agencies for any violations, all provided by Broker Lanter and White Line (the "Scheme").

136.     On, or within hours or days within August 22nd, 2020, Defendant Drivers acted in furtherance of the Scheme by ceasing to drive for the Plaintiff and immediately driving for and began driving for White Line, but while driving and operating Trucks, Trailers, and other equipment owned and leased by the Plaintiff, including fraudulently driving under the Plaintiff's vehicle insurance and Department of Transportation Number.

137.     While Plaintiff still had access to the GPS tracking systems, Plaintiff was able to see where most of his owned and leased vehicles, trailers, and equipment, was moving unlawfully throughout the greater United States, including the State of Texas, without his permission, authorization, or notice.

138.     Since then, Plaintiff has continued to receive notices of accident reports from Highway Patrols, and inspection violations of many of his former drivers, continuing to use the Plaintiff's owned and leased equipment, with Plaintiff's DOT Number, and Plaintiff's Insurance.

139.   It is an industry requirement **and a matter of Public Safety**, to require all Commercially Licensed Drivers to submit to a controlled substance test, when any Driver ceases to drive for one Carrier, to another Carrier.

140.   Due to the continued unlawful driving and usage of the Plaintiff's DOT number, insurance, and equipment, not only is the Plaintiff irreparably harmed and at risk well beyond the liquidated damages formula in the Parties' contract, but the Public at large is at substantial risk to injury, until and unless this unlawful act is immediately and unconditionally enjoined, without bond, at least as between the Defendant Drivers and White Line (including any and all affiliates and brokers whether indirectly or directly connected to White Line).

141.   Plaintiff sent three separate notices on August 24th, 26th, and 27th, 2020 to Defendant Drivers, admonishing them for broken promises, and requesting its vehicles and equipment be returned, as required (equipment includes: Geotab black boxes (ELD/GPS), accompanying black box, Samsung tablet and holder, Drivecams, and Dash Camera System, costing tens of thousands of dollars).

142.   Defendant Drivers ignored Plaintiff and continued on with the scheme, going beyond breaching their Contracts with Plaintiff, and acting maliciously to hurt Plaintiff's business.

## V.

## Causes of Action

COUNT 1 – BREACH OF CONTRACT

143.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

144.   Plaintiff had legally binding contract with Defendant Drivers, which they breached, causing damage to Plaintiff.

## COUNT 2 – UNJUST ENRICHMENT

145.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

146.     Defendants have been wrongfully and unjustly enriched with use of Plaintiffs 'property,

for which Defendants provided no value.

## COUNT – 3 CONVERSION AND TEXAS THEFT LIABILITY

147.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

148.     Plaintiff had exclusive possessory interest of the leased equipment and the personal

property therein and had the legal right to immediate possession under Texas law. Defendants

wrongfully exercised dominion or control over this property, and as a result, Plaintiffs suffered

injury. Texas law provides a civil cause of action for theft of property. Defendants unlawfully

appropriated the property by taking it without authorization or effective consent of Plaintiffs, and

with the intent to deprive Plaintiffs of same. As a result, Plaintiff suffered damage.

## COUNT 4 – TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS

149.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

150.     Defendants directly caused Plaintiff to lose considerable business and revenue with several

vendors, customers, brokers, and lessors of equipment, with whom Plaintiff maintained contractual

relationships therewith, causing Plaintiff to be completely unable to operate its business, since the

day of culmination of the scheme to breach the Contract, causing injury to Plaintiff.

## COUNT – 5 APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

151.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

152.     Plaintiff requires a temporary restraining order and then a temporary injunction preserving

the *status quo* during the pendency of this lawsuit.

153.     A temporary injunction should issue when a party demonstrates (1) a probable right to the relief sought at trial and (2) a probable injury in the interim.  *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.—Amarillo 1995, no writ).  A party demonstrates the first element, a probable right to relief, "by simply alleging a cause of action and presenting evidence [that] tends to sustain it."  *Id.*  This standard does not require proof that the party will finally prevail at trial.  *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 556 (Tex. 1953).  A party demonstrates the second element, a probable injury in the interim, "by tendering evidence of imminent harm, irreparable injury and inadequate legal remedy."  *Miller Paper Co.*, 901 S.W.2d at 597.

154.     Plaintiff has alleged causes of action against Defendants, and as indicated in this verified petition, Plaintiff has shown a probable right of recovery and likelihood of success on the merits. Plaintiff will suffer imminent, irreparable harm without Court intervention, and there is no adequate remedy at law.

155.     As a direct and proximate result of Defendants' wrongful actions as alleged in this petition, absent interim relief, Plaintiff will suffer and will continue to suffer imminent harm and irreparable injury for which no remedy at law exists without the protections of a temporary restraining order and injunctive relief requested.  The imminent harm and irreparable injury includes, but is not limited to, the Defendant Drivers continuing to illegally work (Driving/Hauling Goods for White Line / Broker Lanter, not the Plaintiff) using the Plaintiff's Department of Transportation Number and claiming to be insured under Plaintiff's Insurance Policy. Recently multiple commercial drivers across the nation, working for White Line and Broker Lanter and similarly situated to Defendant Drivers, have been involved in accidents and have failed inspections while operating under Plaintiff's DOT Number and under Plaintiff's insurance policy. As each day passes, the risk

of Defendant Drivers failing inspections or getting in accidents while falsely using Plaintiff's credentials grows.

156.    Not only is there significant risk of ongoing damage to the Plaintiff, but also to the public. 20-Ton Commercial Vehicles are out on the roads of Texas and the United States, under NO insurance coverage, causing accidents and failing inspections, since August 22, 2020. This places the public at large, at extreme risk and danger and therefore must be immediately enjoined.

157.    Plaintiff cannot be compensated for such imminent harm and irreparable injury in money damages. Such damages would be difficult or impossible to calculate and would not be as complete, practical, or efficient to the prompt administration of justice as injunctive relief. Plaintiff requests this Court enjoin White Line and Broker Lanter from utilizing any Defendant Drivers by and through Plaintiff's DOT number and from utilizing any Defendant Drivers by and through Plaintiff's Insurance policy.

158.    The only adequate, effective, and complete relief to Plaintiff is to enjoin the Defendant Drivers from operating for, or on behalf of White Line, and/or Broker Lanter, until each Driver/Defendant has appeared to present to this Honorable Court, the required documentation to establish each has lawfully obtained an appropriate DOT Number, Insurance Coverage, and has successfully completed all requirements under Federal and State law, for Commercial Drivers changing from one carrier, to the next. Pursuant to Texas Rule of Civil Procedure 680 and Texas Civil Practice and Remedies Code section 65.001 et seq., and to preserve the status quo during the pendency of this action, Plaintiff seeks a temporary restraining order, and upon hearing, a temporary and permanent injunction ordering and immediately restraining Defendants, including Defendants' agents, servants, employees, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them as follows:

Defendant Drivers should be ordered enjoined from operating on, or behalf of White Line and Broker Lanter until each Driver/Defendant has shown to meet the lawful requirements for Commercial Drivers to this Court, and Defendants White Line and Broker Lanter should be ordered enjoined from engaging any and all of the named Defendant Drivers, for any future work, until they have appeared in front of this Honorable Court, as well as any other former Driver for the Plaintiff.

159.   Evidence and further detailed explanation of Defendants' wrongdoings including GPS tracking data of Defendant Drivers, evidence of failed inspections and accidents of Former Drivers of Plaintiff wrongfully using Plaintiff's DOT number and Insurance policy while operating under White Line and Lanter, is attached as **Exhibit B.**

160.   Plaintiff is willing to post the necessary and reasonable bond to facilitate the injunctive relief requested, if so required.

161.   Plaintiff requests that the Court grant an ex parte hearing to consider Plaintiff's application.

162.   Under the terms of the contracts between Plaintiff and Defendant Drivers, notice is not required to be given to Defendant Drivers for Plaintiff to be granted a Temporary Restraining Order.

163.   Notwithstanding the foregoing, the Defendant Drivers should not be enjoined from seeking work from a Carrier, other than White Line or Broker Lanter. This injunction does not seek to unlawfully interfere with or restrain trade, nor is it made in bad faith.

## VI.

## Attorneys' Fees

164.   As a result of Defendants' conduct alleged herein, Plaintiff has been forced to retain

attorneys and seek to recover the reasonable and necessary attorneys' fees for services rendered and to be rendered in this case. Plaintiff is entitled to recover attorneys' fees pursuant to section 38.001 and 134.005(b), Tex. Civ. Prac. Rem Code, Tex. Plaintiff seeks to recover reasonable and necessary attorneys' fees through trial, any appeal, and post judgment collection.

## VII.

### Jury Demand & Tex. R. Civ. P. 193.7 Notice

165.    Plaintiff requests a trial by jury and shall tender the jury fee contemporaneous to this filing.

166.    Plaintiff hereby gives notice to all parties that it intends to use all documents produced in response to written discovery at any pre-trial hearing and at trial.

## VIII.

### Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the Defendants herein be cited to appear and answer, and that upon final hearing Plaintiff be awarded a judgment from and against Defendants for all damages available at law and in equity, as well as pre-judgment and post-judgment interest, attorney's fees, and costs of court. Plaintiff further requests that they be awarded such other and further relief, both at law and in equity, as they may show themselves justly entitled.

Respectfully submitted,

**THE MESSINA LAW FIRM, P.C.**

Theodore J. Messina III
State Bar No. 24041475
jmessina@messinalegal.com
Jason Cobb
State Bar No. 24109736
jcobb@messinalegal.com
5910 N. Central Expressway, Suite 1599
Dallas, Texas 75206
Telephone: (214) 420-7333
Facsimile: (214) 206-9593
**ATTORNEYS FOR PLAINTIFF**


Barton C. Mercer, Esq.
FL Bar №. 108565
GUARDIAN LAW, PLLC
Barton@GuardianGroupLaw.com
1065 W. Morse Blvd., Ste. 202
Winter Park, FL 32789
Telephone: (239) 659-4000
**ATTORNEY FOR PLAINTIFF**

EXHIBIT

A

## INDEPENDENT CONTRACTOR AGREEMENT

ISP -Interstate Service Provider Inc ("CARRIER"), an authorized motor carrier, and
Wayne Jordan ("CONTRACTOR"), in consideration of the covenants and
agreements contained herein and pursuant to the federal leasing regulations under 49 C.F.R. Part 376,
enter into this Independent Contractor Agreement ("Agreement") on August 1st , 20 19 .

**1.** **PROVISION OF SERVICES AND EQUIPMENT.** During the term of this Agreement,
CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation
related services, and the use of the equipment set forth below or in an appendix (the "Equipment").
CONTRACTOR represents and warrants that CONTRACTOR has title to or is authorized to contract the
Equipment and services to CARRIER. Upon taking possession of the Equipment from CONTRACTOR,
CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt
required by 49 C.F.R. § 376.11(b). Upon termination of this Agreement, CONTRACTOR shall execute a
similar receipt for equipment as the written receipt for the return of the Equipment by CARRIER to
CONTRACTOR; provided, however, that the Agreement and CARRIER's obligations thereunder shall
expire upon the written notice of termination regardless of whether CONTRACTOR submits the receipt
required under this provision.

| Year | Make | Serial No. | Unit # |
|------|------|-----------|--------|
| 2020 | FRTL | 3ALACWFB5LDLZ2786 | 277529 |
| | | | |
| | | | |

**2.** **DURATION OF AGREEMENT AND TERMINATION.** This Agreement shall begin on the date set
forth above and end exactly one (1) year thereafter. Either party may terminate this Agreement for any
reason by giving ten (10) business days (excluding weekends and federal holidays) written notice to that
effect to the other party either personally, by mail, by fax machine at the address or fax number shown at
the end of this Agreement. CARRIER may terminate this Agreement without the full ten (10) business
days prior written notice if CONTRACTOR abandons its responsibility for providing services under this
Agreement or if the customers serviced by CONTRACTOR voices complaints about the failure of
CONTRACTOR or its employees to meet customer requirements, or if CARRIER loses any such
customer on the account of CONTRACTOR. In the event CARRIER is required to terminate the
Agreement under this provision, CONTRACTOR shall be liable for payment equal to the average daily
compensation set forth in Section 3 below multiplied by the number of days short of ten (10) days for
which the wrongdoing CONTRACTOR failed to give notice of ceasing its responsibility. CARRIER may
deduct any such sum from any final amounts owed to CONTRACTOR under this Agreement. The ability
of either party to terminate this Agreement shall in no way be interpreted as an at-will employment
provision and shall not otherwise affect CONTRACTOR's status as an independent contractor under this
Agreement. The effective date and time of termination shall be as set forth in the written notice or the
receipt for Equipment issued by CONTRACTOR, whichever date is earlier. CONTRACTOR shall, upon
the termination of this Agreement, remove all CARRIER identification from the Equipment and return it to
CARRIER, via hand delivery or certified mail, together with all of CARRIER's property, including trailers,
paperwork, load securement equipment and freight, to CARRIER's nearest terminal. If CONTRACTOR
fails to return CARRIER's property or freight to CARRIER or remove and return all CARRIER
identification from the Equipment upon termination of this Agreement, CONTRACTOR shall pay
CARRIER, all collections costs incurred by CARRIER, including reasonable attorney fees, and CARRIER
may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR.

**3.** **COMPENSATION.** It is expressly understood and agreed that CONTRACTOR's compensation
shall be as set forth in Appendix A, and such compensation shall constitute the total compensation for
everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including
driver's services. All mileage computations shall be based on the most recent edition of CARRIER's
Mileage Guide. Although CARRIER shall use reasonable efforts to make shipments available to

CONTRACTOR for transportation during the term of this Agreement, CONTRACTOR acknowledges and agrees that CARRIER does not guarantee any specific number of shipments or amount of revenue to CONTRACTOR during the term of this Agreement. CONTRACTOR may refuse any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide equipment and other professional truck drivers not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers.

**4. SETTLEMENT PERIOD.** CARRIER shall settle with CONTRACTOR with respect to services provided under this Agreement within 15 calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from its customers, including the signed freight bill, delivery receipt or bill of lading, and properly completed logs as required by the U.S. Department of Transportation ("DOT"). Where CONTRACTOR is paid a percentage of revenue, CARRIER will provide CONTRACTOR with a copy of the rated freight bill (or a computed-generated summary) before or at the time of settlement. CONTRACTOR may examine CARRIER's tariffs, or other contracts or documents, if any, from which charges and rates are computed; provided, however, only that information that would appear on a rated freight bill will be disclosed by CARRIER. CARRIER shall have the right, but not as a condition of settlement and payment, to review all of CONTRACTOR's documents and records relating to the use of the Equipment and the services provided under this Agreement and CONTRACTOR agrees to provide CARRIER with access to such documents and records upon reasonable notice. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER or a letter certifying their removal shall entitle CARRIER to withhold any payments owed to CONTRACTOR until such obligation is met.

**5. CHARGE BACK.** CARRIER shall deduct from CONTRACTOR's compensation, at the time of payment to or settlement with CONTRACTOR, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear. Such expenses shall be deducted from the amount of CONTRACTOR's settlement compensation and shall include those expenses set forth in Appendix A of this Agreement. The amount of each item to be charged back to CONTRACTOR shall be computed based on the actual cost or expense incurred by CARRIER and any administrative fee or mark-up disclosed in Appendix A or elsewhere in this Agreement or any addendum thereto. CARRIER shall provide CONTRACTOR written itemization and documentation of all charge backs where such documentation is necessary to verify the validity of the charge.

**6. INSURANCE.** The respective obligations of the parties shall be as set forth in Appendix B. CARRIER shall maintain public liability, property damage and cargo insurance in such amounts as are required by the DOT and applicable state regulatory agencies. CARRIER shall maintain insurance coverage for the protection of the public pursuant to 49 U.S.C. § 13906. CARRIER's possession of legally required insurance shall in no way restrict CARRIER's right of indemnification from CONTRACTOR as provided under this Agreement. It shall be considered a material breach of this Agreement where CONTRACTOR is determined by CARRIER or CARRIER's insurer to be uninsurable for any reason.

**7. ESCROW FUND.** CONTRACTOR authorizes CARRIER to establish and administer an escrow fund in accordance with the provisions of Appendix C.

8.    **COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.** CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through the DOT, and by various other federal, state, local, and foreign governing bodies. As such, CONTRACTOR hereby acknowledges that he/she possesses full and complete understanding and knowledge of the DOT's CSA program (including, but not necessarily limited to, driver violations and ranking criteria). CONTRACTOR shall adhere to the following provisions of this Agreement to aid CARRIER in discharging its legal duties:

    **(a)**    **Drivers.** CONTRACTOR shall provide competent professional drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations. The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria established by the DOT's Compliance, Safety & Accountability ("CSA") program, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet CARRIER's minimum qualification standards. Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by CARRIER. For all qualified drivers, CONTRACTOR agrees to provide CARRIER with updated DSMS and DIRS driver rankings on a monthly basis.

    **(b)**    **Paperwork Requirements.** CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), CARRIER will keep the original of this Agreement with a copy to be maintained by CONTRACTOR, and a second copy to be carried in the Equipment during the term of this Agreement.

    **(c)**    **Shipping Documents.** CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

    **(d)**    **Drug and Alcohol Testing.** CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

    **(e)**    **Safe Operations.** CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times so as to avoid endangering the public, the driver, and/or the property being transported and in accordance with this Agreement, the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR. CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's policies and procedures and any subsequent revisions thereto, which will be provided by CARRIER.

3

**(f)** **CSA Compliance**.  Beginning on the date the FMCSA makes its CSA Program effective as to CARRIER's and CONTRACTOR's operations under this Agreement, CONTRACTOR shall ensure that CONTRACTOR, and any drivers of CONTRACTOR, and CONTRACTOR's Equipment shall at all times meet CSA safety standards sufficient to enable CARRIER to (a) achieve and maintain a "fit" or similar rating that enables CARRIER to operate without FMCSA intervention or restriction pertaining to driver, equipment, and other CSA performance measures; (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA; and (c) be and remain competitive with similarly situated carriers with regard to safety performance measures under CSA.  CONTRACTOR further agrees to notify CARRIER in writing within two (2) business days of receiving notification from the FMCSA that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety and compliance performance.

## 9. OPERATIONAL EXPENSES.

**(a)** **Operating Expenses**.  CONTRACTOR shall, at its sole cost and expense, provide all the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, state base plates and shall furnish all necessary oil, fuel, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment, including repairs for the operation of such Equipment.  CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, empty mileage, lumper expenses, highway use taxes, weight taxes, state property or indefinite situs taxes, fuel taxes, registration fees, ferry and toll charges, and detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation.

**(b)** **Maintenance and Inspection**.  CONTRACTOR, at its sole cost and expense, shall maintain the Equipment in safe condition and in complete compliance with all laws and regulations of the states in which CONTRACTOR operates and the DOT.  In order to ensure compliance with all DOT regulations, CONTRACTOR shall, at its sole cost and expense, make the Equipment available for inspection by CARRIER upon reasonable request by CARRIER. CONTRACTOR shall, at its sole cost and expense, have the Equipment inspected annually, as required by 49 C.F.R. § 396.17, at CARRIER's maintenance facility or at another maintenance facility which CARRIER may, in its sole discretion, authorize.  CONTRACTOR shall, as directed by CARRIER, forward to CARRIER all inspection, maintenance and repair records for the Equipment.

**(c)** **Fines**.  CONTRACTOR or its drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines, including but not limited to parking and traffic fines and penalties, imposed for violation of any law or regulation by the state or any locality in which CONTRACTOR operates, or the DOT, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.

**(d)** **Overweight and Oversized Shipments**.  CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized or in need of permits before commencing the haul.   Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded and sealed, or the load is containerized, or for improperly permitted oversized and overweight loads, or the trailer or lading is otherwise outside of CONTRACTOR's control.  CONTRACTOR shall pay, or reimburse CARRIER, for any costs or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the vehicle is overweight, oversized or in need of permits.

4

**(e)** **License Plates**.  Upon request by CONTRACTOR, CARRIER may, but is not required to, obtain either a state base plate or a base plate under the International Registration Plan ("IRP") in CARRIER's name for use by CONTRACTOR, the cost of which shall be deducted from CONTRACTOR's compensation.  CONTRACTOR shall remove and return any IRP plate to CARRIER upon the termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct the full cost of the plate from CONTRACTOR's final settlement and escrow funds.  If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such base plate is authorized by CONTRACTOR to be resold by CARRIER to another contractor, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER.  CONTRACTOR shall not be entitled to reimbursement for any unused portion of an IRP plate, however, unless CARRIER is able to reuse or resale the plate to another contractor.

**(f)** **Fuel Taxes**.  For the purposes of computing and paying all state fuel taxes owed for the Equipment, CARRIER shall issue CONTRACTOR a fuel card to be used for all fuel purchases.  All fuel charges and state fuel taxes will be charged back to CONTRACTOR as allowed for under this Agreement along with a monthly fee of $40 for each vehicle contracted to CARRIER.  In the event CONTRACTOR or its drivers fail to use CARRIER's fuel card, CONTRACTOR shall be responsible for providing CARRIER with an accurate accounting of all fuel purchases and miles traveled for the purposes of computing state fuel tax liability, and CONTRACTOR shall provide CARRIER with all original fuel receipts.

**10.** **CARGO CLAIMS**.  CONTRACTOR shall immediately report all cargo claims, including all shortages, overages or other exceptions to the cargo, to CARRIER.  CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $1,500 of each cargo claim, including but not limited to, delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged or contaminated loads, arising out of, or in connection with CONTRACTOR's services.  The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions.  Before deducting any cargo claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.

**11.** **USE OF CARRIER'S TRAILER.** CONTRACTOR agrees to return any trailer, trailer equipment of any kind or purpose, or chassis provided for its use by CARRIER in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted, along with any and all other equipment and property belonging to CARRIER immediately upon CARRIER's request or upon termination of this Agreement.  In the event the trailer is not in as good as condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning.  In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense and costs, including attorney fees, incurred by CARRIER in recovery of its trailer or property from CONTRACTOR or its drivers.  CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private property in order to recover its trailer and property, CONTRACTOR does hereby irrevocably grant CARRIER or its duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER, and its duly authorized agents, from any form of liability whatsoever in connection with such repossession.  CONTRACTOR shall be liable for, and pay, the entire amount for each incident involving direct, indirect and consequential damage, including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's trailers, CARRIER's customer's trailers, other CARRIER equipment, or equipment of any other carrier. Before deducting any such damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such damage.  CONTRACTOR agrees and warrants that any trailer provided for use by CARRIER will only be used by CONTRACTOR and its drivers to transport shipments tendered to CONTRACTOR by CARRIER.

5

**12.    ACCIDENTS AND CLAIMS.**  CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving operations under this Agreement. CONTRACTOR shall be liable for, and CARRIER shall charge back to CONTRACTOR, the first $2,500 of each accident claim, including but not limited to, property damage, personal injury (including death), investigation and clean-up expenses, and towing/recovery costs, arising out of, or in connection with CONTRACTOR's services.  The dollar limit in this paragraph shall not apply to damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of this Agreement, or other culpable acts or omissions.  Before deducting any accident claim from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization for each such claim.  CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder.  CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense, provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses.  CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**13.    HOLD HARMLESS.**  Except to the extent CONTRACTOR's acts or omissions are covered under the parties' respective insurance policies as set forth in Appendix B with no expense to CARRIER, CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER from any direct, indirect and consequential loss, damage, fine, expense, including reasonable attorney's fees, action, claim for injury to persons, including death, and damage to property which CARRIER may incur arising out of or in connection with the operation of the Equipment, CONTRACTOR's obligations under this Agreement, or any breach by CONTRACTOR of the terms of this Agreement.  This provision shall remain in full force and effect both during and after the termination of this Agreement.

**14.    CARRIER RESPONSIBILITIES.**

**(a)    Exclusive Possession and Responsibility.**  The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement.  As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER.  CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER.  Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER.  An independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements.  Notwithstanding the above, Contractor is not prohibited from providing transportation services for other common or contract carriers or any other person or entity, provided that Contractor complies with the trip lease requirements set forth under federal law in 49 C.F.R. Part 376.  CONTRACTOR may trip lease or subcontract the Equipment to a third party upon receiving prior authorization from CARRIER. CARRIER assumes no responsibility for the collection of freight charges or payment to CONTRACTOR for any trip-lease or subcontract related revenue.  During the term of any trip lease or subcontract, CONTRACTOR will remove or cover up all of CARRIER's identification on the Equipment and display instead the trip-lease carrier's identification and, as between CONTRACTOR and CARRIER, CARRIER will have no responsibility for, and CONTRACTOR will fully indemnify CARRIER regarding, the operation of the Equipment.

**(b)    Identification of Equipment.**  CARRIER shall identify the Equipment in accordance with the requirements of the DOT and appropriate state regulatory agencies.  CARRIER shall have the right to place and maintain on the Equipment CARRIER's name and any lettering, advertisement, slogans or designs as CARRIER may choose.  CONTRACTOR shall remove such identification

at the termination of this Agreement or while operating such Equipment for any purpose other than conducting CARRIER's business. At its discretion, CONTRACTOR may have the identification permanently painted on the Equipment. CONTRACTOR further agrees to keep the Equipment in clean appearance and identified as described herein, at its sole cost and expense. CARRIER agrees that CONTRACTOR may display CONTRACTOR's name and address on the Equipment where required by applicable state law.

**15.** **CONTRACTOR NOT EMPLOYEE OF CARRIER.** It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement. CONTRACTOR agrees to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment or the providing of driver services under this Agreement. CONTRACTOR also agrees to provide necessary documentation and apply for certification of its independent contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota. CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers and laborers, and any and all other employees or agents of CONTRACTOR that CONTRACTOR may provide or use to perform any aspect of this Agreement. CONTRACTOR shall be solely responsible for complying with any and all state and federal laws, rules and regulations that may be applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases its license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for CONTRACTOR's employees. CONTRACTOR's performance of these responsibilities shall be considered proof of its status as an independent contractor in fact. Proof of such control and responsibility shall be submitted by CONTRACTOR to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid, proof of income tax being currently paid, and proof of payment of payroll tax for CONTRACTOR's drivers. For the purposes of this section, the term CONTRACTOR refers to the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner. As required by law, CARRIER agrees to file information tax returns (Form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

**16.** **BREACH.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, at any time, by either party in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement; or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct, then the other party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party. If, in CARRIER's judgment, CONTRACTOR has subjected CARRIER to liability because of CONTRACTOR's acts or omissions, CARRIER may take possession of the shipment entrusted to CONTRACTOR and complete performance. In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages, including attorney's fees, incurred by CARRIER as a result of CARRIER's taking possession of the shipment and completing performance.

**17.** **CONTRACTOR NOT REQUIRED TO PURCHASE PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.** CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement. In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, then the parties mutually agree to attach and incorporate each such contract, specifying all terms thereof, to this Agreement as a separate addendum.

**18.** **PASSENGER AUTHORIZATION.** As required by 49 C.F.R. § 392.60, CONTRACTOR shall not allow any passengers to ride in the Equipment unless authorized in writing by CARRIER as required by law. Before passenger authorization will be given by CARRIER, CONTRACTOR (or its driver) and the passenger requesting authorization shall submit a fully executed Passenger Authorization and Release of Liability form to CARRIER for prior approval.

**19.** **LOADING AND UNLOADING.** In the event the shipper or consignee does not assume loading and unloading responsibilities, CONTRACTOR shall be responsible for the loading or unloading of property transported on behalf of CARRIER at CONTRACTOR's expense.

**20.** **CONFIDENTIALITY AND NON-SOLICITATION.** CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, as it may exist now or from time to time, is a valuable, special and unique asset of the business of CARRIER. CONTRACTOR agrees, during and after the term of this Agreement, not to disclose the list of CARRIER's customers or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement. CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER. In the event of any breach or threatened breach by CONTRACTOR of the provisions of this paragraph, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters. CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR. Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR. CARRIER will not solicit traffic from any shipper, consigner, consignee or customer of CARRIER where (1) the availability of such traffic first became known to CARRIER as a result of CARRIER efforts, or (2) the traffic of the shipper, consigner, consignee or customer of CARRIER was first tendered to the CARRIER by CARRIER. If CARRIER breaches this contract and directly or indirectly delivers or solicits traffic from customers of ISP and obtains traffic from such customers during the term of this contract of twenty-four (24) months thereafter, as a result of adverse routing impact arising from loss of business by virtue of violation of this provision, CARRIER shall be obligated to pay CARRIER, for a period of fifteen (15) months thereafter, as liquidated damages and not as a penalty, the amount equal to seventy-five percent (75%) of the transportation revenue resulting from traffic transported for such customers, and CARRIER will provide CARRIER with all documentation requested by CARRIER to verify such transportation revenue.

**21.** **BENEFIT AND ASSIGNMENT.** This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR may not assign or

subcontract all or a portion of its obligations to another party without the prior written consent of CARRIER.

**22.   NOTICE.**  All notices required or permitted by this Agreement shall be in writing delivered personally, by postage prepaid, first class mail, by facsimile machine to the addresses or fax number shown at the end of this Agreement, or by appropriate electronic means as outlined in Appendix D.

**23.   NON-WAIVER.**  The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

**24.   SEVERABILITY.**  If any Agreement or its appendices is deemed invalid for any reason whatsoever, the Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties.  Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close as the parties' original intent as permitted under applicable law.

**25.   GOVERNING LAW AND CHOICE OF FORUM.**  This Agreement is to be governed by the laws of the United States and of the State of Texas, without regard to the choice-of-law rules of Texas or any other jurisdiction.  The parties further agree that any claim or dispute arising from or in connection with this Agreement or otherwise with respect to the overall relationship between the parties, whether under federal, state, local, or foreign law, shall be brought exclusively in state or federal courts closest to CARRIER's corporate office in Roanoke, Texas.

**26.   COMPLETE AGREEMENT.**  The Agreement (including the Appendices and any addendums) constitute the entire agreement between CARRIER and CONTRACTOR pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings.  No supplement, modification, or amendment to the Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Appendix A and insurance deductions in Appendix B.  No waiver of any of the provisions of the Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be deemed effective or binding upon the CONTRACTOR unless executed in writing by the party making the waiver.

**IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this Agreement as of the date stated above.

ISP_____ **(Carrier Name)**
_____ **(Carrier US DOT #)**                    :

1600 Wayne Lanter Rear
Madison, Illinois 62060
Phone:  (618) 219-3951
Fax:     (618) _____

By:_____

_____
     Brian St. John
Printed Name

Check one:
☐          Corporation
☐          Limited Liability Company
☐          Partnership
**X**          Sole Proprietorship

Organized in State of:  Texas
With Employer ID No.:  2320
OR Social Security No. (last 4 digits only)

**CONTRACTOR:**  Wayne Jordan

Fax:
1320 NW Summercrest Blvd APT 1135
Burleson Tx 76028
Address

Phone: 817-881-7170

Cell Phone:

E-Mail Address: bswinn1995@gmail.com

By: _____

Wayne Jordan
Printed Name

---

**RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)**

Received from CONTRACTOR the vehicle or vehicles described in this Agreement.

Equipment received at _____ on _____, 20_____
at _____:_____ o'clock _____.M.



By:_____
    (CARRIER Representative)

_____
Printed Name

---

**RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)**

Received from CARRIER the vehicle or vehicles described in this Agreement in good order.

Equipment received at _____ on _____, 20_____
at _____:_____ o'clock _____.M.



By:_____
    (CONTRACTOR Representative)

_____
Printed Name

---

**RECEIPTS**

<u>**Appendix A**</u>

**CONTRACTOR's Compensation**

1.    <u>**COMPENSATION.**</u>  Unless otherwise agreed to in writing between the parties, CARRIER shall pay CONTRACTOR based on the following amounts:

$ 432.98 per day (for each day worked)

2.    <u>**CHARGE BACK ITEMS.**</u>  The following items shall be charged back and deducted from CONTRACTOR's compensation or from CONTRACTOR's escrow funds in the event that CONTRACTOR's compensation is insufficient:

| CHARGE BACK ITEM | COST | ADMINISTRATIVE CHARGE |
|---|---|---|
| Accident Claim | Actual up to $2,500 per claim | None |
| Advances in Compensation | Actual | None |
| Fuel and Fuel Taxes | Actual | None |
| Other Operating Expenses (See Section 9) | Actual | None |
| IRP Plate | Actual | None |
| Cargo Claim | Actual up to $1,500 per claim | None |
| C.O.D. Charges | Actual | None |
| Fines and Penalties | Actual | None |
| Trailer Damage | Actual | None |
| Insurance Costs | See Appendix B | See Appendix B |

CONTRACTOR agrees that CARRIER may charge back to CONTRACTOR any other expenses or cost incurred by CARRIER for which CONTRACTOR is responsible for under this Agreement or as otherwise agreed to by the parties. CONTRACTOR hereby waives any objection to any charge back item unless CONTRACTOR notifies CARRIER of CONTRACTOR's disagreement with such charge back within thirty (30) days of the charge back.

3.    <u>**CHANGES IN EXISTING DEDUCTION ITEMS.**</u>  If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.** Such modified amounts shall replace and supersede those shown in the table in Section 2 above. If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within the ten-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in Section 2 of the Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

**APPENDIX A**

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                        **CONTRACTOR:**

By: _____          By: _____

_____                _____
Brian St. John                                      Wayne Jordan
Printed Name                                        Printed Name

Dated: _____08-01-2019_____     Dated: _____08-01-2019_____

---

**APPENDIX A**

## Appendix B

## INSURANCE AND ALLOCATION OF LIABILITY

1.      **CARRIER'S INSURANCE OBLIGATIONS.**    It shall be CARRIER's responsibility, pursuant to DOT regulations promulgated under 49 U.S.C. § 13906 and  pursuant to applicable state laws, to provide public liability, property damage, and cargo liability insurance for the Equipment at all times while the Equipment is being operated on behalf of CARRIER.  However, CARRIER's possession of such insurance shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in this Agreement.

2.      **CONTRACTOR'S INSURANCE OBLIGATIONS.**  CONTRACTOR shall maintain, at its sole cost and expense, the following minimum insurance coverages during this Agreement:

(a)      **NON-TRUCKING LIABILITY** - CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER trailer) is not being operated on behalf of CARRIER (including, but not limited to, whenever the Equipment is being operated on behalf of others pursuant to a Trip Lease or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

(b)      **WORKERS' COMPENSATION/OCCUPATIONAL ACCIDENT INSURANCE**. CONTRACTOR shall provide workers' compensation insurance coverage for CONTRACTOR (if a natural person), all of its employees and agents, anyone driving the Equipment, or serving as a driver's helper, and any other persons required to be covered under the workers' compensation law of any state that is reasonably likely to have jurisdiction over CONTRACTOR's business operations and in amounts not less than the statutory limits required by such applicable state law.   The worker's compensation insurance policy shall provide principal coverage in the CONTRACTOR's state of domicile and the state in which the work is principally localized if different, and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming.  As evidence of such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CONTRACTOR's verification before operating the Equipment under this Agreement.

So long as the state in which the work is principally localized is not Massachusetts, Nevada, New Hampshire, New Jersey, or North Carolina, then CONTRACTOR's and their 1099 Independent Contractor Drivers and Helpers may, as an alternative to obtaining workers' compensation coverage, obtain an Occupational Accident insurance policy that includes either an endorsement or a separate policy provision whereby the insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR, or CONTRACTOR 1099's, alleging employee status.  Such Occupational Accident insurance coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Certificate of Insurance section of this Appendix (and shall include the following minimum terms: $1,000,000 minimum combined single limit; $500 minimum maximum weekly temporary total disability limit; $250,000 accidental death and disability limit; contingent liability coverage that will provide coverage equal to statutory

**APPENDIX B**

workers' compensation benefits in all states; with CARRIER named as an additional insured on the policy).

**(c)** **PASSENGER INSURANCE.**  CONTRACTOR shall procure, carry, and maintain passenger liability insurance that shall provide coverage to CONTRACTOR whenever the Equipment is being operated (whether or not on behalf of CARRIER) in a combined single limit of not less than _____ Dollars ($____,000) for injury or death to any person riding as a passenger in the Equipment or for damages to that person's property in any one occurrence.  Such coverage shall be no less comprehensive than the coverage CARRIER will facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Section 5 of this Appendix.  In addition, such coverage shall be primary to any other insurance that may be available from CARRIER.  CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**(d)** **OTHER INSURANCE**.  In addition to the insurance coverages required under this Agreement, it is CONTRACTOR'S responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs.  As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property.  CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Illinois or Texas law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

3.    **REQUIREMENTS APPLICABLE TO ALL OF CONTRACTOR'S INSURANCE COVERAGES.**    CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A"-rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld).  CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR'S insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.  Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

4.    **CONTRACTOR'S LIABILITY IF REQUIRED COVERAGES ARE NOT MAINTAINED.**  In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement.  In addition, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

5.    **AVAILABILITY OF INSURANCE FACILITATED BY CARRIER.**  CONTRACTOR may, if it so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR'S behalf, the insurance coverages

**APPENDIX B**

required or made optional by this Agreement. In any such case, CARRIER shall deduct, from CONTRACTOR settlement compensation, amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage. In addition, if CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct, from CONTRACTOR's settlement compensation, amounts reflecting all of CARRIER's expense in obtaining and administering such coverage. CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter. CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6. **CHANGES IN COST OR OTHER DETAILS OF COVERAGES.** If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Section 5 of this Appendix and the cost to CONTRACTOR for, or other details of, a coverage changes from the information listed in the attached "CERTIFICATE OF INSURANCE", CONTRACTOR will be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten (10) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's settlement compensation, beginning immediately after the 10-day period. Such modified amounts shall replace and supersede those shown in the Certificate of Insurance and CARRIER shall not have an obligation to also provide a revised Certificate of Insurance.** If CONTRACTOR fails to notify CARRIER of any objection within the 10-day period -- or if CONTRACTOR notifies CARRIER of its objection within the 10-day period and CONTRACTOR and CARRIER are then unable to resolve the matter to their mutual satisfaction -- CONTRACTOR and CARRIER shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                    **CONTRACTOR:**

By: _____          By: _____

_____Brian St. John_____          _____Wayne Jordan_____
Printed Name                                    Printed Name

Dated: ____08-01-2019_____          Dated: ____08-01-2019_____

---

**APPENDIX B**

## CERTIFICATE OF INSURANCE

CONTRACTOR hereby requests CARRIER, through its insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages CONTRACTOR has selected by placing CONTRACTOR's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. **Non-Trucking Liability Insurance:** <br><br> *Per coverage overview* | _X_ YES <br><br> ____ NO |
| 2. **Occupational Accident Insurance:** <br><br> *Per coverage overview* | _X_ YES <br><br> ____ NO |
| 3. **Physical Damage Insurance on Tractor:** <br><br> *Per coverage overview* | _X_ YES <br><br> ____ NO |
| 4. **Deductible Buy-Back Insurance:** <br><br> *Per coverage overview* | ____ YES <br><br> _X_ NO |
| 5. **Health Insurance** <br><br> *Per coverage overview* | ____ YES <br><br> _X_ NO |
| 5. **Passenger Insurance** <br><br> *Per coverage overview* | ____ YES <br><br> _X_ NO |

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**             **CONTRACTOR:**

By: _____      By: _____

_____ Brian St. John _____      _____ Wayne Jordan _____
Printed Name                  Printed Name

Dated: _08-01-2019_____      Dated: _08-01-2019_____

**APPENDIX B**

**APPENDIX B**

## Appendix C

### ESCROW

As authorized by Paragraph 7 of this Agreement, CARRIER shall establish and administer an Escrow Fund, which CONTRACTOR and CARRIER agree shall be governed by the following terms and conditions:

1.    **PRINCIPAL**.  The amount of principal to be held in the Escrow Fund shall be a minimum of $ __0__ , which amount is to be deducted from CONTRACTOR's compensation at $__0__ per mile every week beginning the first week of services provided by CONTRACTOR under the Agreement.  If, at any time, the principal amount in escrow falls below $__0__ , CONTRACTOR authorizes CARRIER to deduct from CONTRACTOR's compensation a maximum amount of $__0__ per week until the full principal amount is replenished.

2.    **SPECIFIC ITEMS TO WHICH ESCROW FUND MAY BE APPLIED**.  The Escrow Fund shall be held by CARRIER for the purpose of insuring compliance with the provisions of the Agreement. The specific items to which the Escrow Fund shall apply are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by CARRIER, or owed by CONTRACTOR to a third party under a purchase or rental contract, that are CONTRACTOR's responsibility under the Agreement-- specifically, the charge-back and deduction items set forth in Appendix A and other appendixes (hereafter "Escrow Items") -- to the extent that the amounts owed by CONTRACTOR for such Escrow Items exceed CONTRACTOR's earned and payable compensation at the time of any settlement or final accounting.

3.    **ACCOUNTINGS**.  While the Escrow Fund is under CARRIER's control, CARRIER shall provide an accounting to CONTRACTOR, no less frequently than monthly, of all transactions involving such funds by clearly indicating on individual settlement sheets the amount and description of any deduction or addition made to the Escrow Fund.   In addition, upon CONTRACTOR's request, CARRIER shall provide CONTRACTOR with an accounting of any transactions involving CONTRACTOR's Escrow Fund.

4.    **INTEREST**.  CARRIER shall pay interest to CONTRACTOR on the Escrow Fund on at least a quarterly basis ("interest period") beginning with receipt of the first CONTRACTOR contribution of principal.  The interest rate shall be established on the date the interest period begins and shall be equal to the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of Treasury.  For purposes of calculating the balance of the Escrow Fund on which interest is paid, CARRIER may deduct a sum equal to the average advance (including all charge-backs and other deductions) made to CONTRACTOR during the period of time for which interest is paid.

5.    **FINAL SETTLEMENT**.   To have any remaining balance in the Escrow Fund returned following termination of the Agreement, CONTRACTOR must first comply with all of the specific obligations set forth in the Agreement, and make payments to CARRIER for all Escrow Items.  At the time of the return of any remaining balance in the Escrow Fund, CARRIER may deduct monies for all Escrow Items.  Such deductions shall be limited to amounts CARRIER actually spends, incurs, or owes to a third party, or that CONTRACTOR owes to CARRIER or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any CONTRACTOR obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by CARRIER in seeking the return of its identification devices and other property, all amounts CARRIER actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. CARRIER shall not make deductions from the Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither CONTRACTOR nor CARRIER has yet made an expenditure or incurred a quantified, legally binding obligation to pay.  CARRIER shall provide a final accounting to CONTRACTOR of all such final deductions made from the Escrow Fund within forty-five (45) days from the date of termination of the Agreement.

**APPENDIX C**

6. **RETURN OF ESCROW BALANCE.** In no event shall the Escrow Fund, less any final deductions pursuant to the above provision, be returned to CONTRACTOR later than forty-five (45) days from the date of termination of this Agreement. CARRIER's use, or post-termination return to CONTRACTOR, of any balance in the Escrow Fund shall not constitute a waiver of CARRIER's right to recover, through arbitration or other available legal means, any additional amounts CONTRACTOR owes, or comes to owe, CARRIER under this Agreement.

**THIS APPENDIX** is agreed to by the undersigned parties as of the latest date set forth below.

**CARRIER:**                                          **CONTRACTOR:**

By: _____            By: _____

_____Brian St. John_____            _____Wayne Jordan_____
Printed Name                                          Printed Name

Dated: ____08-01-2019_____            Dated: ____08-01-2019_____

**APPENDIX C**

**Appendix D**

**DEDUCTION FOR SUBLEASE OF EQUIPMENT**

CONTRACTOR hereby authorizes and directs CARRIER to deduct from CONTRACTOR's compensation and to remit directly to Logistics Resource Solutions, Inc. ("Supplier"), the amount of $ 370 per week , beginning on 8 1 , 2019 together with all other amounts due and owing Supplier, pursuant to the terms and conditions of the attached Sublease Agreement entered into by CONTRACTOR and Supplier on 8 1 , 20 19 This Appendix E is being executed by CONTRACTOR and CARRIER to comply with the requirements of 49 C.F.R. § 376.12(i), and constitutes an addendum to the INDEPENDENT CONTRACTOR OPERATING AGREEMENT entered into by CONTRACTOR and CARRIER.

**THIS APPENDIX D is agreed to by the undersigned parties as of the latest date set forth below.**

**CARRIER**                                      **CONTRACTOR**

By: _____              By: _____
          Signature                                         Signature

_____                  _____
Brian St. John
          Printed Name                                   Printed Name
                                                 Wayne Jordan

08-01-2019 _____              08-01-2019 _____
          Date                                              Date

---

**APPENDIX D**

**Appendix E**

**CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS**

Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), Interstate Service Provider ("Carrier") and the contractor who completes the signature block below ("Contractor") hereby consent and agree to conduct business using electronic means. This consent encompasses the use of electronic methods to effect the signature of any document required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status. Contractor agrees that the above electronic method, which Carrier has adopted to effect electronic signatures: (1) identifies and authenticates Contractor as the source of the electronic communication; (2) indicates Contractor's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature to the same document.

**Contractor:** Wayne Jordan
Name (Typed or Printed)
**If Sole Proprietor:**
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
Social Security No.
**If Corp., Prtnrship, or LLC:**
_____
Fed. Taxpayer ID No.

By: _____
Signature
Wayne Jordan
Authorized Representative's Name (Typed or Printed)
Driver
Title
1320 NW Summercrest Blvd APT 1135
Address (Street, P.O. Box)
Burleson Tx 76028
City, State & Zip Code
817-881-7170
Telephone Number      Fax Number
bswinn1995@gmail.com
Email Address

**Carrier:**

By: _____
Signature
Terminal Manager
Title
899 Henreitta Creek Rd
Address (Street, P.O. Box)
Roanoke
City, State & Zip Code
817-521-7466
Telephone Number      Fax Number
b.stjohn@isplogistics.com
Email Address

**APPENDIX E**

EXHIBIT
B

CAUSE NO. _____

| | | |
|---|---|---|
| INTERSTATE SERVICE PROVIDER, INC | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| *Plaintiff* | §<br>§ | |
| VS. | §<br>§ | DENTON COUNTY, TEXAS |
| WAYNE JORDAN | §<br>§ | |
| *Defendant* | § | _____ JUDICIAL DISTRICT |

## AFFIDAVIT OF BUSINESS RECORDS

**STATE OF TEXAS**

**COUNTY OF DALLAS**

Before me, the undersigned authority, personally appeared Jim Pepper who, being by me duly sworn, deposed as follows:

"My name is Jim Pepper. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts stated herein. I am the custodian of records for Interstate Service Provider, Inc. I am the individual at Interstate Service Provider, Inc. with the authority to speak on behalf of Interstate Service Provider, Inc. ("Interstate") as it pertains to the facts stated herein. Attached hereto are 271 pages of records from Interstate Service Provider, Inc. These said 271 pages of records are kept by Interstate Service Provider, Inc., in the regular course of business, and it was the regular course of business for me or any employee or representative of Interstate Service Provider, Inc. with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the originals."

Interstate is in the business known as "Commercial Shipping Work", which can be defined as hauling goods/products to and from large manufacturers, wholesalers, and end-users of the goods/products, e.g. John Deere, Ford Motor Co., Advanced Auto, etc., in Commercial Grade Equipment ("Equipment" e.g. *Tractor-Trailers*). This Commercial Shipping Work is called "Traffic", in our Industry. Traffic is usually procured by a Broker, on behalf of the Broker's Customer, to be expedited by a Carrier, who uses Commercial Drivers licensed to drive and operate the Equipment.

The Broker knows little to nothing about the routing or strategy utilized in expediting the Traffic; specifically, the Broker does not typically have any specific knowledge relating to the manner or means by which the transport takes place, including the method used to transport customer goods from point of origin, to its next destination. This specific knowledge typically rests within the province of the expertise of a Carrier such as Interstate Service Provider, Inc. The Broker is considered the Customer of the Carrier.

The Carrier's expertise is the knowledge, know-how, and experience of how to expedite the pickup, transportation, and delivery of the Broker's Customer's goods, to its destination, both safely and timely. The Carrier hires Drivers licensed to drive/operate commercial grade equipment (including leased equipment from companies such as Ryder Truck Co.) through either an independent contractor or employee relationship, to expedite the Traffic using the Carrier's expertise.

- The Carrier has a unique Department of Transportation Number ("DOT Number"), used to identify the individual Carrier;

- To ensure the utmost quality of its services to the Broker and the Broker's Customer, the Carrier uses one or only a few Drivers to operate the same Route, entrusting the Driver with all of the Carrier's Confidential and Trade Secret knowledge, skill, and expertise.

- The Drivers utilized in Commercial Shipping Work are required to have a Valid Commercial Driver's License.

- When any Driver changes from one Carrier to another, the Department of Transportation requires the new Carrier, prior to the new Driver to be behind the wheel for the new Carrier, to have the new Driver pass a qualification process (the "Onboarding Process") that includes, but may not be limited to:

  o Physical Drug and Alcohol Test

  o Background Check

  o Employment Verifications

  o Motor Vehicle Records Check ("MVR")

- After the approximate 1 to 2-weeks it takes a Driver to complete the Onboarding Process, it takes a new Driver approximately an additional 5 to 10 consecutive business days for Interstate to train any new Driver on any of its Routes, due to their complexity.

Traffic requiring overnight and/or just-in-time delivery demands very specialized expertise and knowledge that is considered to be Confidential Trade Secrets of the Carrier, and in high demand by customers. The Carrier considers a "Route" to be all of the required knowledge, skill, and expertise of how to expedite Traffic for a specific Customer of the Broker, including Confidential and Trade Secret knowledge. This is one reason Interstate Service Provider, Inc. entered into very specific contracts including restrictive covenants with its drivers. Just-In-Time Delivery ("JIT delivery") refers to the practice of a Broker's Customer holding less

inventory, requiring faster, overnight shipping, when its supply runs low, as opposed to storing mass quantities of the same product/good, saving more money on storage of unused product, than the increased cost of overnight/JIT delivery. JIT delivery requires the experience and know-how of Interstate's Trade Secrets.

Lanter Delivery Systems, LLC ("Lanter") was a Broker with a contractual relationship with Interstate Service Provider, Inc. up until the contract termination date of August 22, 2020. While Lanter and Interstate had a contractual relationship, all of Interstate's Drivers were either Independent Contractors or employees of an independent company contracted with Interstate.

When Lanter terminated its relationship with Interstate, Interstate's Drivers were contacted by Lanter and persuaded to leave Interstate and continue to drive the very same Routes it had been driving, learned from Interstate, but to drive for White Line Systems, LLC ("White Line"). Additionally, Ryder Truck Company immediately notified Interstate of its termination of all of Interstate's equipment leases.

Prior to August 22, 2020, White Line had only operated and expedited Traffic in the State of California and never had expedited Traffic in any of the States in which Interstate operated. When any Commercial Driver, such as Interstate's former Drivers

Interstate maintained access to GPS data on all of its equipment leased from companies such as Ryder, for a period of time, after August 22, 2020, which demonstrated that most of its equipment continued to be used and moved, over the same Routes it had been expediting Traffic for Lanter's customers. This observation revealed that the Drivers, White Line, and Lanter were utilizing the know-how and specific knowledge base that Interstate provided to the Drivers,

under contractually agreed upon protection and prohibition of dissemination to White Line, or Lanter.

Additionally, since August 22, 2020 and continuing until recently, Interstate has received notice from state authorities that its former Drivers have been involved in traffic accidents with injuries. The Drivers have also failed inspections. These accidents and failed inspections have occurred while the Drivers, presumably on behalf of Lanter and White Line, have been and unlawfully using Interstate's Department of Transportation number and insurance coverage, expediting Traffic over the same Routes the Drivers learned from Interstate. Interstate has received notice of both the accidents and failed inspections only through unsolicited notice from law enforcement, as part of its accident investigation, or through the random occurrence one of Interstate's former Drivers is stopped for a traffic (not "Traffic", as defined in here) violation, or stopped for being overweight, at a weight station.

Considering GPS data shows most of Interstate's Equipment continued to move throughout its Routes, and my personal observation of former Interstate Drivers, immediately after August 22, 2020; Lanter actively and openly persuaded Interstate's Drivers to leave ISP and work for White Line; former Interstate Drivers are still operating under Interstate's DOT Number and Insurance; former Interstate Drivers are failing inspections on Interstate's Routes; former Interstate Drivers are causing accidents on Interstate Routes; and all of the other specific observations noted in this affidavit, and with my personal knowledge that neither White Line nor Lanter possessed the specific knowledge of how to expedite the Traffic on Interstate Routes but is currently expediting, it is more likely than not that Lanter, White Line, and the Drivers are currently utilizing the specific intellectual property that belongs to Interstate.

_James L. Pepper_  PRESIDENT

NAME AND TITLE    JAMES L. PEPPER

STATE OF FLORIDA

COUNTY OF ORANGE

Based upon his best knowledge and recollection, the accuracy of the foregoing affidavit was sworn to, affirmed, and signed before me and in my physical presence, this 4th day of March, 2021, by Jim Pepper, of Interstate Service Provider, Inc., who appeared to be of sound mind, communicated his understanding of the content, meaning, and obligations of the foregoing instrument, and who produced a Illinois Drivers License, as identification, in accordance with Florida Statutes Chapter 117.

NOTARY PUBLIC, STATE OF FLORIDA

LYSETTE M. ASEN
Notary Public-State of Florida
Commission # HH 83767
My Commission Expires
January 21, 2025

_Lysette M Asen_

Typed / Printed Name of Notary Public

Jim Pepper Affidavit

PAGE 6